May it please the Court, Cal Potter, on behalf of Dr. Jerry Vlasak and his wife Pamela Vlasak, the plaintiffs, knowing that the Court is familiar with the facts of this case, I'd like to focus on why the Court erred in granting summary judgment in this matter. I would appreciate it if you would concentrate on the excessive force piece of this as you make your comments. Yes, Your Honor, and I think what is important here in looking at the excessive force situation here is the Court was looking at it from a standpoint of consent, so there was no consent as to the excessive force. The light of the testimony from not only Dr. Vlasak, but also Dr. Ray Greek, who was an anesthesiologist, my client Dr. Vlasak is an emergency room physician, both of these And the testimony from the light most favorable to the plaintiffs from the position of Dr. Vlasak as well as Dr. Greek is that the officers essentially attacked him and that at one point in time they had him down, they had a knee in his back, one officer had a choke hold on him, and at that point in time he began to gasp and cry for help. And it was the voice that Dr. Greek testified to of an individual who he believed to be suffocating at that point in time. I would submit to the Court that in the application that we've cited, the Drummond v. City of Anaheim case, that this is a situation that is very fact-intensive, and the District Court even acknowledged that in fact there were disputes of fact as to what had actually taken place. The District Court did go off on this consent issue that if in fact these officers had been the right to prevent the doctor from entering his own room. I would submit to the Court that that is not what happened, that's not the testimony, and it's acknowledged by the District Court that Pamela Vlasak, who was held in... So is there a dispute of fact on the question of consent as well? There's a dispute of fact on almost every issue in this particular case, and it goes down to the credibility issue. When the Court was looking at this, I would point out, and I don't think it's without a proper foundation, the officer that's involved in this was convicted of armed robbery or robberies in the casinos down in Las Vegas, Jack Brandon. He is a convicted felon. He was deposed in the Nevada prison system. He is the officer who wrote the report, and what's important in looking at the police report is what were they looking for. They weren't looking for any type of explosives. They were looking for what they called anarchist materials. So you have a situation here where the concern were about ideas, not about explosives, not about dangers to the community, other than perhaps having dangerous ideas that were not mainstream, at least from the Stevens Group's ideas about the treatment of animals and all Pamela Vlasak was... Can you help me with the interplay between saussure versus tats and excessive force claims? I understood the district court to be saying that consent was relevant in looking at the subjective understanding or belief of the officers posted outside the door as to whether or not they reasonably believed that consent had been given and that they'd been ordered by their supervisor to prevent anybody from entering the room until the search could be conducted. Is there any dispute about the evidence with regard to what the two officers at the door believed at that time? Certainly, Your Honor. I mean... What is the dispute? The dispute is that Pamela Vlasak testified and the district court acknowledged that she never gave consent. Okay.  No. She did not talk to the two officers. So tell me what the officers knew and from whom they knew it and how those facts are in dispute. Because of the fact that she never said that she gave any type of consent, the argument is, and that was part of the conspiracy, what you had here was an idea. If you accept that they are told this by Officer Powell and Sergeant Schallhub and passes it on, then that is the basis and that's his predicate. Our argument is that that isn't what happened, Judge. That's what I understand the district courts who have been focusing upon, what the sergeant said to the two men who were posted outside the door. But if you take the basic predicate that she says she never said, she never gave any consent, then these people are lying. And that's what the whole conspiracy was about. So there are two possibilities, either she never gave consent to anyone and therefore they were not told it and they were lying, or they were told it and their superiors were lying. Correct. If she's telling the truth. If she's telling the truth. And that's what's important in terms of summary judgment. Let's look at the credibility of the individuals. Well, wait, wait, wait, wait. Don't we focus at this point on what the two officers outside the door believed? In other words, is there any dispute that Sergeant Schallhub, or however you pronounce his name, the sergeant, told them consent had been given and we're coming up, don't let anybody in? Yeah, Your Honor. The basic fact, if she never said that she gave consent, how could she ever say that? I don't care. I'm trying. You're not understanding my question. No, I understand your question. I think what I hear you saying is the sergeant must be lying because she said that she never said that to him. But how would the two men at the door know that if what they had been told by their superior was we have consent and we don't let anybody in, we're coming up to search the room? Because Jerry Vlasic, who was right there at the time, never gives them consent, nor did they ask for it. But if their sergeant told them that consent had been given, it couldn't have come from him, right? The reasonable inference that should be drawn is that Dr. Vlasic, who was going into his room, does not give consent. I mean, there's absolutely no showing that he gives consent. What is the... Consent can be taken back. Counsel, what is the relevance, if any, and I wish I remembered the name of it right now. There's a recent Supreme Court case which basically discusses the relationship between consent of one spouse and the other, and that one can withhold consent even though the other grants it. Is that ringing a bell to anyone? Unfortunately, there's no ringing of the bell, Your Honor, but I would also... I'm wondering, because even if she did give consent, and he is an equal occupant of the room, whether her consent is valid in spite of his objection... That's the least she ever gave consent. The difficulty is that she never gave consent. I know that. Let's assume that she did, or that they were told that she had, even if they were told incorrectly. My point is a different one. They're standing there, and they know that the wife, who's not there right now, has given consent. That's what they're told. But there's the husband saying, this is my room, and I don't give consent. So now what? Now what? We go to the excessive force. That's a legal matter. Then it doesn't matter. Then you focus on Jerry Blasik's arguments, corroborated by anesthesiologist Dr. Ray Greek, both saying, even if there's consent, Judge, you can't use excessive force, and that's what this case is about. It's not a consent case. It's an excessive force case. But consent has to go into the first prong, doesn't it? And that is whether or not a constitutional right was violated. And the constitutional right here has to be an unlawful entry into the room. No. No, because there's no entry into the room. There's no entry into the room at that point. But that is the law. It's an excessive force case, Judge. It's whether they have a right to... Mr. Potter, we have been reversed before for not following the two-prong inquiry under Saussure v. Katz. And the first prong is, we must determine whether or not a constitutional right has been violated. And to get there, we have to decide whether or not the officers had a lawful right to prevent anybody from entering the room, whoever he claimed to be, until such time as their sergeant arrived with Mrs. Blasik. You don't have a right to use excessive force in doing it, though, Judge. You do, instead, have a reasonable belief, do you not, Mr. Potter, that the consent had been given and that no one was to disturb the integrity of the room until the search was conducted, and anybody who attempted to interfere with you in the performance of that duty would be subject to arrest for interfering with a police officer. And if he physically resisted that arrest, then force could be used to overcome it. Judge, that's the testimony of the police. The testimony of the two doctors is he's attacked. But we have to look at the two-step inquiry, do we not, of Saussure v. Katz, and isn't that what the Supreme Court tells us we must do in analyzing it? I think we have to look at the same analysis as Gunn and Drummond. What is reasonable? What is the fact-specific situation here? And you have a standpoint of the two officers at the door, correct? Correct. Okay. But you can't just, and that's what the district court did, he forgot about Dr. Ray Greek. Dr. Greek's testimony isn't taken into consideration. In fact- Is his testimony relevant with regard to whether or not they believed that they had a lawful order from their superior to prevent entry into the room, and that Dr. Vlasic was physically resisting the lawful command of a police officer, do not enter this door? Yeah, it's relevant because the testimony is they attacked him. They didn't make those same type of, what you're saying is, you know, Mr. Police Officer, I'm here, I'm going to tell you to look, I don't want you to, that's not what their testimony is. The testimony is that they attacked him as he was trying to enter the room, and there was talk about- He admitted that he resisted. And- He admitted he resisted? No. And that's, you've got to look at the testimony of Dr. Vlasic as well as Dr. Greek. He goes to edit in his deposition, and it seemed to me that he said he resisted, but even in chokehold. You know, your time has run out. I've got one question, but it can be short. How old was Dr. Vlasic at the time of this event? I believe it was in his late 40s, early 50s. Thank you, counsel. We will restore some rebuttal time since we used a lot of it with questions, and we'll hear now from Mr. Angelo. Thank you, Your Honor. May it please the Court. My name is Peter Angulo. I represent Las Vegas Metropolitan Police Department. Counsel, I want to start where we kind of left off with the previous discussion. Let's assume that there was a lawful order, that there was consent and there was a lawful order, and the officers thought that they could preclude anyone from coming into the room. Can't there still be an excessive force claim? I mean, to use his example, if someone walked in and said, hey, this is my room, and they were shot dead on the spot, unarmed, I mean, I guess I'm not sure why the fact of consent, if that is correct, precludes a claim of excessive force. It does not, and I don't believe Judge Dawson's analysis went that far. What the consent issue does is establishes the propriety of the officer's thought process standing there to keep people from the room. Now, do you remember the Supreme Court case that I have in mind? I'm just struggling to remember the name of it. I'm not good with names. Unfortunately, I don't remember the name of the case, but I do know the holding of the decision, which said that one spouse can, in fact, revoke the consent of another spouse. Okay, so how is that relevant to our Saussure v. Katz analysis on the first point, whether there was, in fact, consent that would translate into the officer's reasonable belief they could keep everybody out, including him? It's twofold, Your Honor. In the first place, the Supreme Court decision is extremely recent, it just came out. So clearly established law at the time would have been what the officers believed, which is that one spouse could, in fact, consent and hold that over someone else. But more importantly, the factual record was that these gentlemen were not informed, listen, the husband's coming up and he's not going to give consent or he's not going to be very happy with this. What they were told was the person who'd rented the room, the officers had them in custody, and that they had given consent to search the room and they wanted to have these two officers secure the room until they could get up and perform their search. How long were they standing there? I believe the record indicates they had been there just a few minutes before he started coming up to the door. And they were told, as they recounted... They were told that the officers... You're waiting for us to come up with a key? Correct. No, that the officers were coming up with the person who had rented the room, and that they had received consent, they were going to perform a search, and they were to secure the room until the officers arrived. And they were going to come up with Mrs. Vlasic? They didn't mention the name, but the individual who had rented the room, but they would come up as a group. And was there any indication that they ever brought her up? Yes. At what time did they bring her up? I believe, Your Honor, her testimony was that they get there at the very end as she's being put in handcuffs. And when she's there, I know she gets there, and she's being brought up physically by them at that time. That's my understanding. Correct, Your Honor. They come in as a group. Well, since we, in this conversation, we seem to be in agreement that the fact that there is consent, and the fact that there, if it is a fact, and that they believe that they can secure the room doesn't necessarily preclude a claim of excessive force, because you can stop someone, but not with excessive violence. And that fact, and that principle was clearly established at the time of these acts. Absolutely. So why isn't the testimony of Dr. Greek and of Dr. Vlasic sufficient to create an issue of fact about the proportionality of their response to this situation, even given their pure state of mind up until that point? I appreciate that, Your Honor. I suppose the quickest answer is that Judge Dawson considered the testimony. We're looking at it de novo. I don't want to know about that. I appreciate that. What is our view of that? Dr. Greek and Dr. Vlasic's testimony, both are consistent with the fact that, one, he was told before he made the move to the door that he was not allowed to go in. Two, that he said, it's my room, I'm going in, and that he pushed past the officers to put his door key in the door. The analysis is used from the officer's standpoint, given a lawful order, their lawful commands to keep people out of that room. They had a right. Can I stop you right there? From the officer's standpoint, they've told him, you're not going in. But we have testimony that, at that time, if we believe his evidence, they have not identified themselves as police officers. That is to say, if that's true, that they've not identified themselves as police officers, they're supposed to judge his reaction based upon, well, some private whatever it is, hotel security person or some other person, some non-police officer, has told them. Now, it may well be a lawful order from a policeman, but he doesn't know that, and they're supposed to gauge... Accepting it in the testimony in his favor. Yeah, yeah. There may be conflict as to who said what, but accepting his version of this, they're supposed to gauge what he's doing and his sort of disobeying of their order, not that he's disobeying the lawful order of a policeman. He's disobeying what they've told him, and they're not police officers, as far as he knows. Right. Your Honor, but from their standpoint, their test, the officer's testimony says they identified themselves first as police officers. Yeah, but I don't care about that for this purpose, because he says they didn't. So I've got to, for this purpose, I've got to take it his way. What he says is he didn't hear them identify themselves as police officers. He doesn't say that they never identified themselves. And they also had... Listen, take the premise that I think we have to take, that he does not know that they are police officers, and they did not say it. Okay. Now, that may not prove to be true once we have, you know, ordinary testimony, trial, and so on. But this is summary judgment. Right. Your Honor, again, the issue of qualified immunity is from under saucier, is the standpoint of the officer's... Of course. ...understanding. Their testimony is that they believe they identified themselves as police officers. And while I... Would you please understand what we have to do at summary judgment? I have to take it as true that they did not identify themselves as police officers. Now, it may turn out that upon testimony, we get testimony that's entirely believable that they did. But at this point, he says no. This is a... Dr. Vlasic says no. Again, Your Honor, I respectfully disagree. My recollection of the record, and certainly the court's, I could be in error, but was that Dr. Vlasic said he did not hear them say it. And it's a distinction that's important. I wish I could recall offhand the name of the Ninth Circuit decision, but there was a decision made about an entry where officers identified themselves as police officers went into the house. The person inside the home said, I never heard the officers identify themselves as police officers. The decision the Ninth Circuit came to was, but the officers from their standpoint knew they had said it, and they had a right to presume that people inside the home had heard them say that. Do you think it would be United States versus banks? I actually think it was after that decision, Your Honor, because it was a civil rights case in which we were. I think banks is a knock and enter. But it's a long... And so that's why I think it is relevant to the inquiry in this case. Okay. But from the officer's standpoint, they're wearing badges. They have them on their belts. And... Are they visible? It's their perception that it is, in fact, visible. And so... My understanding of the testimony from Dr. Dweek is he sees the badge, but it's during the struggle. And I assume they're wearing coats like you're wearing. Oh, no, Your Honor. They're casually dressed. I think they have a shirt on of some sort. Oh, okay. Whether it's a polo shirt or not, I don't recall directly. Okay. Dr. Dweek's viewpoint, though, is from a peephole inside the window, seeing the badge of the officers. And so whether he sees or doesn't see... Because they're standing between the door and Mr. Vlasic as he approaches. I don't know how accurate that's his perception. I've got an approximate. Do you know the age of Dr. Vlasic? I actually thought we included that. I want to say he was in his early 40s, late 30s. Okay. If it's in here, I can find it. I just don't recollect it. Yeah. I believe you did. At any rate, from the officer's standpoint, they had a right to use force then to control or resist a subject. Dr. Vlasic admits he resisted, admits that he kept trying to get away from these people to try and get to the door. And from their standpoint, then, the officers... Well, no, I don't think trying to get to the door. No, the testimony is that he put his key card in the door, and at that point, that's when they get him. That is to say... He said he became stiff. I'm not sure that counts as the kind of resisting. I mean, becoming stiff might or might not justify enormous force. Correct. Correct, Your Honor. But then he testifies that what he continued to do was to try and get away from them to get to the door and get in his room. And the officers responded with force. The force that they ultimately used is not a chokehold, but is what's called a lateral vascular neck restraint. Dr. Vlasic describes it as such, although he calls it a chokehold, but his physical description of it is clear that it's an LVNR. Dr. Greek specifically says this isn't a martial arts chokehold. This is something where they put the elbow around the larynx of the neck, and they're applying pressure on the side. And we've cited in the court a number of decisions which have said that's not a use of deadly force. That's a use of restraint control force under appropriate circumstances to get him under control. Dr. Vlasic's testimony is that that, as he's resisting, that that's done. They put him in handcuffs, and then the pressure's released, and in that situation, he's placed under arrest. I just wanted to say one more time, as I understand his testimony, you're saying he didn't remember whether they said they were police officers, but his actual testimony was, the two men approached me, what did they say? They said words to the effect of, you can't go in there. Did they identify themselves as police officers? No. I apologize, Your Honor. And I'll retract my prior statement. My recollection was that he said he did not recall. And the answer is, you didn't recall. That's correct. I see my time is up. Unless there are additional questions, I'll sit down. Thank you very much. And we'll give you a minute back for rebuttal, since we used quite a bit of it with questions. First of all, the officers are undercover officers, and the testimony of Jack Brannan is he's either wearing a golf shirt, with it over the, intentionally over the badge, or an Oxford-type shirt, button-down shirt, with the shirt tails out. Because what they were trying to, what he testified is, they were trying to be involved with undercover work. They had been involved outside of the hotel with totally unrelated people. But also, it's important, as Dr. Vlasic testified, he thought these were thugs. And Dr. Greek testified that he, in fact, went in the room to call the police. And one of the concerns he has is that the operators wouldn't let him go out of the hotel and went directly back to security, and he didn't go out to the police. And I would just make those factual representations. Thank you, counsel. We appreciate the arguments of both counsel. The case just argued is submitted, and we'll take about a ten-minute recess.
judges: Graber, W. Fletcher, Tallman